# United States Court of Appeals

## For the Eighth Circuit

_____

No. 13-1165

_____

Sarah Jackson, Special Administrator for the Estate of Troy Allen Tucker

*Plaintiff - Appellant*

v.

Joseph Buckman, Dr., St. Vincent Hospital; Pulaski County Detention Facility; Williams, Warden, Tucker Unit, ADC; James, Assistant Warden, Tucker Unit, ADC; - Cobbs, Major, Tucker Unit, ADC; Rectenwald, Dr., Tucker Unit, ADC

*Defendants*

Doc Holladay, Sheriff, Pulaski County; originally sued as Doc Holiday; Carl Johnson, Dr., Pulaski County Regional Detention Facility; Catherine Smith, Nurse, Pulaski County Regional Detention Facility; originally sued as C. Smith; Rhonda Anderson, Nurse, Pulaski County Regional Detention Facility; originally sued as Anderson; Donna Washburn, Nurse, Pulaski County Regional Detention Facility; originally sued as Washburn

*Defendants - Appellees*

Wright, Deputy, Pulaski County Detention Facility; K. Lacking, Deputy, Pulaski County Detention Facility; Felix, Dr., Diagnostic Unit, ADC; Hall, Major, Diagnostic Unit, ADC; John Doe, Warden, Diagnostic Unit, ADC

*Defendants*

Randy Morgan

*Defendant - Appellee*

Maxim Healthcare Services, Inc.

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: March 11, 2014
Filed: June 27, 2014

_____

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Troy Tucker brought this lawsuit alleging that, during his incarceration as a pretrial detainee, he received constitutionally deficient medical care and that medical officials used excessive force against him while responding to his medical emergency.[1]  The district court[2] granted the defendants' motions for summary judgment with respect to Tucker's claims brought under 42 U.S.C. § 1983 and dismissed his state-law claims without prejudice.  Tucker appeals, and we affirm.

_____

[1]Tucker died while this appeal was pending, and Sarah Jackson was substituted as a party in her capacity as the special administrator of Tucker's estate.  *See* Fed. R. App. P. 43(a)(1); Fed. R. Civ. P. 25(a)(1).

[2]The Honorable Jerome T. Kearney, United States Magistrate Judge for the Eastern District of Arkansas, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

## I.    Background

Tucker was incarcerated as a pretrial detainee at the Pulaski County Regional Detention Facility ("PCRDF") from approximately September 28, 2009 until March 1, 2010.  Shortly after his arrival, Tucker began complaining about various medical concerns, including a surgical thread that was protruding from a wound on his abdomen (the "surgical wound").  This surgical wound arose after Tucker underwent bowel obstruction surgery almost a year earlier.  Although Tucker testified that the surgical wound was "[n]ot really" infected when he arrived at PCRDF, Tucker complained of bleeding from and severe pain around the surgical wound in a grievance dated September 30, 2009.  Tucker alleges that, around this same time, Nurse Catherine Smith told him that she did not have to treat the surgical wound because it predated his incarceration.  Tucker raised further concerns about the surgical wound in early October 2009, this time complaining in a grievance that "sometimes pus[] and/or blood seeps out of it."  Tucker worried that an "[i]nfection could set in" around the surgical wound.  Tucker filed another grievance shortly thereafter, which he addressed to Randy Morgan, the Chief of Detention at PCRDF, that reiterated his concerns about the surgical wound.

Tucker met with Dr. Carl Johnson, a physician who worked at PCRDF, on or about October 16, 2009.  During this appointment, Tucker raised his concern about the surgical wound as well as numerous other medical concerns, including his history of colon cancer, his asthma, pain in his fingers and toes, and soreness around his port—a medical device that had been implanted under the skin on Tucker's chest to facilitate his previous chemotherapy treatment.  Dr. Johnson's report shows that he ordered Tucker to continue taking six of his prescriptions, provided Tucker with cream for his hands, and had Tucker sign a form consenting to the release of his previous medical records to PCRDF. Dr. Johnson also examined Tucker's abdomen, which Dr. Johnson reported as being soft, non-tender, and non-distended, with bowel sounds being present.  Dr. Johnson thus concluded that "[t]here was nothing unusual

-3-

about [Tucker's] stomach, per se, that was a major concern at that point." Tucker concedes that Dr. Johnson examined his abdomen but nonetheless asserts that Dr. Johnson failed to examine the surgical wound visually by lifting Tucker's shirt. Dr. Johnson does not recall whether he performed a visual examination of the surgical wound at this time.

Less than a week later, Tucker complained in a grievance appeal that Dr. Johnson had not examined the surgical wound. Tucker expressed concern that the "thread hanging out could cause [an] infection." On November 3, Tucker filled out a sick call form in which he repeated his concerns about the surgical wound. Two weeks later, on or about November 17, Tucker saw Dr. Johnson for a second time. It is undisputed that Dr. Johnson visually examined the surgical wound this time. Dr. Johnson reports observing a "small purulent wound with a mild rash on [Tucker's] mid-abdomen" that he described as "minor." Dr. Johnson prescribed an oral antibiotic, antibiotic cream, and pain medicine as treatment for Tucker. Tucker acknowledges that Dr. Johnson treated his surgical wound this time but testified that the surgical wound was still bleeding and draining pus when he left PCRDF.

On January 7, 2010, Tucker lost consciousness near the door of his cell. Several guards and nurses, including Nurse Rhonda Anderson and Nurse Donna Washburn, responded to the emergency medical code. Upon their arrival, Tucker contends that Nurse Anderson administered an ammonia inhalant so that he would regain consciousness and, while doing so, hit his nose. Tucker analogized the blow to a "karate hit." Tucker, however, never received any medical treatment for his nose. It did not bleed, and the "karate hit" did not leave a cut, a scratch, or a bruise. Tucker's contemporaneous descriptions of the incident, contained in a grievance and an appeal therefrom, do not mention this alleged "karate hit."

Before moving him from the floor, Tucker concedes that the nurses checked his heart rate and blood pressure. Once this check was complete, the nurses asked the

guards to carry Tucker to his bed. The guards, Tucker alleges, refused to help the nurses. As a result, Nurse Anderson and Nurse Washburn lifted Tucker, who was 6'3" and weighed approximately 170 pounds, by his arms and dragged him to his bed. Tucker testified that rather than place him gently on his bed, the nurses dropped him on it, causing the middle part of his back to strike the side of the bed and leading to an injury to his back. As evidence of his injury, Tucker points to Nurse Washburn's report documenting this incident, which recounts that once Tucker had been placed on the bed, she cleaned and dressed a "[q]uarter size skin tear" on Tucker's left hip. The nurses then left Tucker's cell, at which point Tucker contends that Nurse Anderson said "that ought to wake him up."

Tucker sued Dr. Johnson, Nurse Smith, Nurse Anderson, Nurse Washburn, and various other officials, including Doc Holladay, the Sheriff of Pulaski County, Arkansas, and Morgan. The district court granted the defendants' motions for summary judgment with respect to Tucker's § 1983 claims and dismissed Tucker's state-law claims without prejudice. This appeal followed.

## II. Discussion

We review the grant of summary judgment *de novo*, *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009), affirming if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). In order to survive a properly supported motion for summary judgment, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## A. Deliberately Indifferent Medical Care

As a pretrial detainee, Tucker's right to medical care arises under the Due Process Clause of the Fourteenth Amendment. *See Vaughn v. Greene Cnty.*, 438 F.3d 845, 850 (8th Cir. 2006). Although Tucker's claim is rooted in the Fourteenth Amendment, we apply the deliberate-indifference standard that governs claims brought by convicted inmates under the Eighth Amendment. *See id.*; *Fourte v. Faulkner Cnty.*, 746 F.3d 384, 387 (8th Cir. 2014).

Whether an official was deliberately indifferent requires both an objective and a subjective analysis. *Scott v. Benson*, 742 F.3d 335, 339-40 (8th Cir. 2014). Under the objective prong, Tucker must establish that he suffered from an objectively serious medical need. *See id.* at 340. To be objectively serious, a medical need must have been "diagnosed by a physician as requiring treatment" or must be "so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). Under the subjective prong, Tucker must show that an official "actually knew of but deliberately disregarded his serious medical need." *Id.* This showing requires a mental state "akin to criminal recklessness." *Id.* (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Consequently, Tucker must show "more than negligence, more even than gross negligence" to evince deliberate indifference. *Fourte*, 746 F.3d at 387 (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)). Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference. *Id.* at 389; *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). An inmate must demonstrate that a prison doctor's actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany v. Carnahan*, 132 F.3d 1234, 1240-41 (8th Cir. 1997).

Tucker's primary argument is that Dr. Johnson's failure to examine his surgical wound visually in October 2009 amounted to deliberate indifference. Starting with the objective prong of the deliberate-indifference inquiry, Tucker asserts that a bloody, purulent, and painful surgical wound such as his is readily identifiable by a layperson as requiring medical treatment. *Cf. Hartsfield v. Coburn*, 371 F.3d 454, 456 (8th Cir. 2004) (explaining that suffering "extreme pain from loose and infected teeth, which caused blood to seep from [plaintiff's] gums, swelling, and difficulty eating and sleeping" is a need for medical attention obvious to a layperson). Although Tucker's testimony that the surgical wound was "[n]ot really" infected when he arrived at PCRDF and his speculation after he first saw Dr. Johnson that the "thread hanging out *could* cause [an] infection" may suggest otherwise, we assume without deciding that the surgical wound constituted an objectively serious medical need when Tucker first saw Dr. Johnson. *See Krout v. Goemmer*, 583 F.3d 557, 568 (8th Cir. 2009).

There is no genuine dispute of material fact with respect to whether Dr. Johnson was deliberately indifferent to this medical need. Tucker's complaint is not that Dr. Johnson completely refused to examine his abdomen in October 2009. Indeed, Tucker admits that Dr. Johnson examined his abdomen in certain respects at this time. Dr. Johnson's treatment notes confirm as much by documenting his observations that Tucker's abdomen was soft, non-tender, and non-distended, and that bowel sounds were present. As a result of this examination, Dr. Johnson concluded that "[t]here was nothing unusual about [Tucker's] stomach, per se, that was a major concern at that point." Tucker's complaint, then, is that Dr. Johnson's examination of his abdomen should have been more extensive in light of Tucker's concern about the surgical wound. In particular, Tucker contends that Dr. Johnson should have visually examined the surgical wound. However, absent from the record is any evidence that Dr. Johnson's examination of Tucker's abdomen was "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany*, 132 F.3d at 1241. Dr. Johnson testified that his examination of Tucker's

-7-

abdomen was sufficient to conclude that it did not need treatment at that time, and it is undisputed that Dr. Johnson ordered treatment for several of Tucker's other maladies as a result of this same appointment. It also is undisputed that after Tucker continued to complain about the surgical wound, he saw Dr. Johnson again, who prescribed medication and an antibiotic ointment for the surgical wound.

At most, Tucker has established that Dr. Johnson should have known that his examination of Tucker's abdomen on October 16 was professionally deficient. This is tantamount to a showing of medical malpractice or negligence, not deliberate indifference. *See, e.g.*, *Fourte*, 746 F.3d at 389 ("At best, [the evidence] show[s] that [medical officials] should have known they were committing malpractice—but medical malpractice is not deliberate indifference."); *Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment."). We thus affirm the grant of Dr. Johnson's motion for summary judgment.

We also affirm the grant of summary judgment to Nurse Smith. In his briefs, Tucker refers to a comment that Nurse Smith purportedly made about the surgical wound. Tucker testified that when he arrived at PCRDF, Nurse Smith told him she did not have to treat the surgical wound because it predated his incarceration. However, Tucker has not identified any evidence that Nurse Smith ever refused or failed to treat the surgical wound. *Cf. Dulany*, 132 F.3d at 1239 ("Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs.").[3]

---

[3] Absent an underlying constitutional violation, Tucker's official-capacity and failure-to-supervise claims against Holladay and Morgan necessarily fail. *See Wilson v. Spain*, 209 F.3d 713, 717 (8th Cir. 2000); *McCoy v. City of Monticello*, 411 F.3d

## B.    Excessive Force

We turn now to Tucker's claim that Nurse Anderson and Nurse Washburn used excessive force against him while responding to Tucker's medical emergency. The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from "the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)). Because the Due Process Clause "prohibits *any* punishment of a pretrial detainee, be that punishment cruel-and-unusual or not," *Edwards v. Byrd*, 750 F.3d 728, 732 n.2 (8th Cir. 2014) (emphasis in original), we ask whether the defendant's purpose in using force was "to injure, punish or discipline" the detainee, *id.* at 732 (quoting *Putnam v. Gerloff*, 639 F.2d 415, 421 (8th Cir. 1981)). An official's use of force does not amount to punishment in the constitutional sense if it is "but an incident of some other legitimate governmental purpose." *Bell*, 441 U.S. at 535, 538 (providing an analogous rule in the context of a conditions-of-confinement challenge brought by pretrial detainees). Moreover, conduct that is merely negligent or grossly negligent does not implicate the protections of the Due Process Clause. *See, e.g.*, *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Clemmons v. Armontrout*, 477 F.3d 962, 966 (8th Cir. 2007); *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 955 (8th Cir. 2001). The objective indicia relevant to the excessive-force analysis under the Fourth Amendment guide this due-process inquiry. *See Andrews v. Neer*, 253 F.3d 1052, 1060-61 & 1061 n.7 (8th Cir. 2001) (setting forth relevant factors, including "the need for the application of force, the relationship between the need and the amount

---

920, 922 (8th Cir. 2005). To the extent Tucker asserts that Morgan, who is not a physician, was deliberately indifferent for his personal involvement in Tucker's medical care, this claim lacks merit for much the same reason: there was no constitutional violation in which Morgan could have participated. *See Wilson*, 209 F.3d at 717. We thus affirm the grant of Holladay and Morgan's motion for summary judgment with respect to Tucker's medical-treatment claims.

of force that was used, the extent of the injury inflicted, and whether [the force] was used for punishment or instead to achieve a legitimate purpose"); *see generally Kingsley v. Hendrickson*, 744 F.3d 443, 449-53 (7th Cir. 2014).

But a *de minimis* quantum of force is not actionable under the Due Process Clause. *See Bell*, 441 U.S. at 539 n.21 ("There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned." (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)); *cf. Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992) ("The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)); *Chambers v. Pennycook*, 641 F.3d 898, 906 (8th Cir. 2011) (stating that under the Fourth Amendment, "[a] *de minimis use of force* is insufficient to support a claim" (emphasis in original)). Even though such a trivial use of force may be cognizable under state tort law, "the Fourteenth Amendment is not 'a font of tort law to be superimposed upon whatever systems may already be administered by the States.'" *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)).

Viewing the evidence in the light most favorable to Tucker, Nurse Anderson's act of hitting Tucker's nose, which he likened to a "karate hit," was a *de minimis* use of force that is not actionable under the Due Process Clause. *See Leary v. Livingston Cnty.*, 528 F.3d 438, 443-45 (6th Cir. 2008) (concluding that a "karate chop kind of deal" to a pretrial detainee's neck that did not cause pain and that the detainee did not perceive as a threat is a *de minimis* use of force); *see also Askew v. Millerd*, 191 F.3d 953, 958 (8th Cir. 1999) ("Section 1983 is intended to remedy egregious conduct, and not every assault or battery which violates state law will create liability under it." (quoting *Haberthur v. City of Raymore*, 119 F.3d 720, 723 (8th Cir. 1997)). To begin with, Tucker never saw a doctor or a nurse for an injury to his nose. The "karate hit,"

as Tucker concedes, did not cause any objectively verifiable injury. Tucker's nose did not bleed from the blow nor did it leave a bruise, a cut, or even a scratch on his nose. Furthermore, on the day of the incident, Tucker filed a grievance against Nurse Anderson complaining about her handling of the incident. This contemporaneous grievance detailed multiple, specific objections about Nurse Anderson's behavior—ranging from her attitude to her statements and actions—but failed to mention that she struck his nose or that this act caused pain or injured his nose in any way. Consequently, immediately after the incident, Tucker did not perceive Nurse Anderson's act to be objectionable enough to include in his grievance. Tucker's grievance appeal, which he filed several days later, also failed to mention the "karate hit" by Nurse Anderson. The only alleged effect of the "karate hit" that we can discern from Tucker's testimony is that, along with the ammonia inhalant, Nurse Anderson's act prompted him to regain consciousness and that "the stress factor went up" as a result. These negligible effects, however, do not render such an act, which did not cause an objectively verifiable physical injury and which was not objectionable enough to include in Tucker's contemporaneous grievance, cognizable under § 1983. *See Leary*, 528 F.3d at 445 ("Whatever else non-actionable *de minimis* force may be, it must include a touching that neither 'hurt' nor threatened the individual.").

Tucker also contends that genuine issues of material fact remain with respect to his claim that Nurse Anderson and Nurse Washburn used excessive force by dragging him to his bed and dropping him on it. We disagree. The force used by the nurses to move Tucker to his bed was incidental to their legitimate purpose of responding to and mitigating Tucker's medical emergency. *See Bell*, 441 U.S. at 538; *cf. Vaughn*, 438 F.3d at 850 (describing a pretrial detainee's due-process right to medical care). Tucker acknowledges that, when they responded to the medical emergency code, Nurse Anderson and Nurse Washburn came to the scene to help him. Indeed, before they lifted him from the floor, the nurses checked his heart rate and his blood pressure. After doing so, the nurses asked the guards to move Tucker

to his bed because, as Nurse Washburn explained, "I needed to get him up off that floor." But the guards, according to Tucker, refused to help the nurses. This left Nurse Washburn and Nurse Anderson, who Tucker described as a "small person," to carry Tucker to his bed. Tucker was 6'3" and weighed approximately 170 pounds. Although Tucker contends that the nurses roughly dragged him to his bed and dropped him on it, there is no indication in the record that the nurses' purpose in moving Tucker to his bed was anything other than responding to and mitigating the medical emergency. *See Bell*, 441 U.S. at 538 ("A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."); *Edwards*, 750 F.3d at 732.

Tucker's contention that being dropped on the bed injured his back does not alter this conclusion. *See Andrews*, 253 F.3d at 1061 & n.7 (explaining that the extent of any injury inflicted can be relevant to the due-process inquiry); *cf. Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (stating in the Eighth Amendment context that "[t]he extent of injury may . . . provide some indication of the amount of force applied"); *Chambers*, 641 F.3d at 906 (reaching an identical conclusion in the Fourth Amendment context). Tucker testified that the nurses released their grip on his arms before they had laid him on the bed, causing his back to strike the side of the bed as he fell. Tucker admits that he never received any medical treatment for the resulting pain in his back. Nonetheless, as evidence of this injury, Tucker points to Nurse Washburn's report documenting the January 7 incident, in which she stated that after moving Tucker to his bed, she treated a "[q]uarter size skin tear" on Tucker's left hip. Even if this injury to Tucker's left hip—as opposed to the middle part of his back, where Tucker testified that his back struck the bed—resulted from being dropped on the bed, Tucker's minor injuries are, under the circumstances, an insufficient basis to infer that the nurses' purpose was to punish, injure, or discipline him. *See Edwards*, 750 F.3d at 732. At most, these injuries suggest that the nurses should have insisted on having assistance before moving Tucker or failed to use due care when moving him by themselves. But "the Due Process Clause is simply not implicated by a

negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels*, 474 U.S. at 328 (emphasis omitted).

As evidence that the nurses' actions amounted to punishment, Tucker also relies on his allegation that as Nurse Anderson was leaving his cell, she said "that ought to wake him up." This argument overlooks relevant context. Moments before Nurse Anderson allegedly made this statement, she had, according to Tucker, administered an ammonia inhalant to Tucker that was designed to "wake him up." Absent other evidence suggesting a purpose to injure, punish, or discipline a detainee, a statement that is facially innocuous in context is insufficient to generate a genuine issue of material fact. However, even if this context is ignored, this statement is insufficient to generate a genuine dispute in light of the evidence discussed above. Considering Tucker's admission that the nurses came to the scene to help him, the nurses' provision of medical treatment, their attempt to return Tucker to his bed, and the fact that Tucker suffered only minor injuries, it would require speculation to infer a purpose to punish, injure, or discipline Tucker on the basis of Nurse Anderson's statement. *See Dulany*, 132 F.3d at 1241; *see also Matsushita Elec. Indus.*, 475 U.S. at 586 (requiring more than "some metaphysical doubt as to the material facts" in order to survive summary judgment).

Consequently, we affirm the grant of Nurse Anderson's and Nurse Washburn's motions for summary judgment on Tucker's excessive-force claim.[4]

---

[4]Without an underlying constitutional violation, Holladay and Morgan cannot be liable on a failure-to-supervise theory or in their official capacities for the nurses' alleged use of excessive force. *See Wilson*, 209 F.3d at 717; *McCoy*, 411 F.3d at 922.

## III.    Conclusion

For the reasons described above, we affirm.[5]

_____

---

[5]Tucker also asks that we reverse the dismissal of his state-law claims without prejudice, provided that we reverse the grant of summary judgment on any of his § 1983 claims.  Due to our resolution of this appeal, we affirm the dismissal without prejudice of Tucker's state-law claims.