# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3069

_____

Michael Patrick Keefe, an individual

*Plaintiff - Appellant*

v.

City of Minneapolis; Tim Dolan, former Minneapolis Chief of Police, in his personal capacity; and Janeé Harteau, Minneapolis Chief of Police, in her official capacity[1]

*Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 7, 2014
Filed: May 11, 2015

_____

Before MURPHY, SMITH, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

---

[1]For Michael Keefe's official-capacity claims, Janeé Harteau is substituted for her predecessor, Tim Dolan, as the Minneapolis Chief of Police. *See* Fed. R. App. P. 43(c)(2).

Michael Keefe sued the City of Minneapolis ("City") and Tim Dolan, the former Chief of Police for the Minneapolis Police Department, for various federal and state claims. The district court[2] granted the defendants' summary judgment motion as to Keefe's federal claims and declined to exercise jurisdiction over the remaining state claims. Keefe appeals this ruling, and we affirm.

## I.

In March 2007, Keefe, a lieutenant of the Minneapolis Police Department ("MPD"), was assigned to be the commander of the Violent Offenders Task Force ("task force"). The task force was a collaboration between multiple agencies, including the MPD, the Federal Bureau of Investigation ("FBI"), the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and the U.S. Attorney's Office. MPD leadership removed Keefe from the task force in August 2007, and Chief Dolan demoted Keefe to the rank of sergeant in September 2009.

During Keefe's time as commander, the task force conducted a wiretap investigation of a gang. Keefe learned that some gang members had threatened to kill police officers. Keefe told an Assistant U.S. Attorney and an ATF agent about the threat. Believing that local law enforcement should be notified, Keefe also told a local police chief that the U.S. Attorney's Office would brief the chief's department about an ongoing investigation. ATF officials believed that this disclosure was inappropriate because the investigation involved a wiretap. Accordingly, an ATF supervisor emailed Keefe stating that he was "a detriment to this investigation," had "exhibited . . . poor judgment in making [an] unauthorized disclosure," and was "prohibited from entering ATF office space." An ATF agent forwarded this email to Keefe's captain.

---

[2]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

Later, as part of an unrelated investigation, the FBI and the MPD arrested a suspected gang leader. During an interview, the suspect named six MPD officers who he claimed were corrupt. Four of these officers were African American and two were Caucasian. The suspect's claims triggered a corruption investigation into the six named officers in which the suspect served as an informant. Keefe, who is Caucasian, doubted some of the informant's claims and confronted the informant about his allegations during a second interview. Keefe claims that this second interview exposed inconsistencies in the informant's story, but an FBI agent thought Keefe's questioning was harming the investigation and ended the interview. Keefe then held a meeting with other task-force members and explained his belief that the informant was lying. Keefe also shared his concerns with his captain. After these events, FBI officials met with Chief Dolan and told him that Keefe was harming the investigation. Chief Dolan removed Keefe from the investigation.

Sergeant Patrick King, an MPD officer who was part of the corruption investigation, grew concerned that Keefe was harming the MPD's relationship with its federal task-force partners. Sergeant King reported his concern to MPD leadership. Around the same time, ATF officials shared their concerns about Keefe's conduct with the MPD. MPD leadership decided to remove Keefe from the task force. Shortly after being reassigned, Keefe lodged a misconduct complaint against Sergeant King, alleging that he used racial slurs, abused overtime procedures, and improperly permitted unauthorized officials to be on a task-force email listserv. Internal Affairs ("IA") investigated the complaint and, after interviewing various task-force members, determined that Keefe's complaint was unfounded.

After filing this complaint against Sergeant King, Keefe made an anonymous telephone call to Chief Dolan's wife. Keefe told her that Chief Dolan needed to know that the FBI was corrupt and that "they're blackmailing the lieutenant." During an interview as part of an IA investigation, Keefe admitted that he placed this telephone call and that he had not carried his gun or badge for several months while serving as

a police officer because he was afraid of being framed or shot by federal agents. As Keefe explained, "I quit carrying a badge and gun because of these dirty bastards, fearful that they'd shoot me." On February 27, 2008, Keefe was placed on administrative leave with pay pending the outcome of this investigation. As part of the investigation, Keefe submitted to a psychological fitness-for-duty exam, and a psychologist cleared him to return to work without restriction. The IA investigation found that Keefe had violated MPD policy by anonymously calling Chief Dolan's wife and failing to carry his gun and badge. As a result, Keefe received an eight-hour suspension without pay.

The MPD brought two additional IA cases against Keefe. In case 08-010, Keefe was accused of making false statements about Sergeant King, making false accusations about another sergeant, using racist epithets, being banned from the FBI's and the ATF's offices, and maintaining inappropriate relations with the media. In case 09-086, Keefe was accused of several violations of MPD policy related to his statements that fellow MPD members were going to be indicted. On May 8, 2009, Keefe was again placed on administrative leave pending the result of the investigations. Around this time, the FBI banned Keefe from its office space and circulated a notification that included a photograph of Keefe and urged its employees to "PROCEED WITH CAUTION" if they encountered Keefe.

Keefe received disciplinary hearings for cases 08-010 and 09-086 where he was represented by his union. At the hearing for case 08-010, Keefe gave a lengthy statement of about forty minutes, insisting that other officers were going to be indicted. Keefe's statements and behavior during the hearing made the disciplinary panel members concerned. After this hearing, Keefe was relieved from duty with pay and subjected to a second fitness-for-duty examination. A psychologist found Keefe conditionally fit for duty but noted in his report that "[i]f Lieutenant Keefe is unable to immediately let go of his obsession(s) that indictments are pending . . . it would demonstrate to the MPD that his behavioral issues cannot be resolved and

-4-

subsequently could render an opinion that he is unfit for duty." The MPD sustained several allegations against Keefe in case 08-010 and sustained three allegations from case 09-086. Specifically, in case 08-010, a disciplinary panel found Keefe responsible for levying untruthful allegations against other MPD officers, using racist language, being banned from the FBI's and the ATF's offices, and having inappropriate relationships with the media. In case 09-086, a disciplinary panel found that Keefe had violated the MPD's code of conduct as to truthfulness, ethics, and discretion. Chief Dolan demoted Keefe to the rank of sergeant on September 27, 2009.

Meanwhile, the corruption investigation of MPD officers led to the arrest and indictment of Michael Roberts, then an MPD officer. Keefe received a subpoena to testify at Roberts's criminal trial but never testified because Roberts pleaded guilty. Around the time of Roberts's scheduled trial, the *StarTribune*, a newspaper, published an article titled "Did Minneapolis police officer spin lies?" The article reported that Keefe was suspended for "allegedly spreading rumors that officers and FBI agents lied about their handling of a long-term police corruption investigation and were going to be indicted."

Keefe filed an action in Minnesota state court, bringing both federal and state claims against the City and Chief Dolan. The defendants removed the case to federal court. Keefe's federal claims were (1) a 42 U.S.C. § 1983 substantive due process claim, (2) a 42 U.S.C. § 1986 claim for failure to prevent a conspiracy to interfere with civil rights, (3) a 42 U.S.C. § 1981 retaliation claim, and (4) a *Monell* claim against the city, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The defendants moved for summary judgment. The district court granted summary judgment to the defendants on each of Keefe's federal claims and then declined to exercise supplemental jurisdiction over Keefe's state-law claims. The district court remanded the remaining state-law claims to Minnesota state court. Keefe appeals.

**II.**

We review a grant of summary judgment *de novo*, *Jackson v. Buckman*, 756 F.3d 1060, 1066 (8th Cir. 2014), and we affirm if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has the obligation to come forward with specific facts showing that there is a genuine issue for trial." *Walz v. Ameriprise Fin., Inc.* 779 F.3d 842, 844 (8th Cir. 2015) (quoting *B.M. ex rel. Miller v. S. Callaway R-II Sch. Dist.*, 732 F.3d 882, 886 (8th Cir. 2013)). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)). "A complete failure by the non-moving party 'to make a showing sufficient to establish the existence of an element essential to that party's case . . . necessarily renders all other facts immaterial.'" *Walz*, 799 F.3d at 844 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "[W]e may affirm a district court's order, including an order granting summary judgment, on any basis supported by the record, even if that ground was not considered by the district court." *Saulsberry v. St. Mary's Univ. of Minn.*, 318 F.3d 862, 866 (8th Cir. 2003) (quoting *Viking Supply v. Nat'l Cart Co., Inc.*, 310 F.3d 1092, 1097 (8th Cir. 2002)).

**A. Section 1983—Substantive Due Process**

To recover under § 1983 for a substantive due process violation, Keefe must show, among other things, that the offender violated a fundamental right in a way that "shocks the conscience." *See Folkerts v. City of Waverly, Iowa*, 707 F.3d 975, 980 (8th Cir. 2013). Keefe claims that a conscience-shocking constitutional violation arose from the defendants' interference with "his right to enjoy employment opportunities in his chosen field." Specifically, Keefe alleges that the defendants "engineered and steered sham investigations" in order to discredit and silence him.

Assuming without deciding that these allegations show a violation of a fundamental right, we hold that Keefe's § 1983 claim nonetheless fails because the alleged conduct on which Keefe relies does not rise to the level of "so egregious, so outrageous, that it may fairly be said to shock the contemporary consciences." *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

In support of his argument that the defendants engineered sham investigations that violated his substantive due process rights, Keefe cites *Moran v. Clarke*. 296 F.3d 638 (8th Cir. 2002) (en banc). As we explained in *Moran*, "substantive due process is concerned with violations . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Id.* at 647 (second and third ellipses in original) (internal quotation marks omitted) (quoting *In re Scott Cnty. Master Docket*, 672 F. Supp. 1152, 1166 (D. Minn 1987)). In *Moran*, the plaintiff presented evidence that state actors purposefully manufactured false evidence that led to his criminal trial. *Id*. at 639-42. *Moran* explained that an employee has a right to be free from "stigmatizing conduct, at least without an opportunity for a name-clearing response." *Id.* at 645 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 573 (1972)).

But here, none of what Keefe experienced was so severe as to shock the conscience. Keefe claims that he unjustly suffered multiple adverse employment actions including a suspension, removal from the task force, placement on administrative leave, and demotion. None of these adverse employment actions were so severe as to shock the conscience in the way that pursuing a criminal conviction of an innocent man does. *See id*. at 639-47. This is particularly true because Keefe admitted to some of the misconduct that supported the resulting adverse employment actions. Indeed, Keefe admitted to placing an anonymous phone call to Chief Dolan's wife and to failing to carry his firearm and badge for several months. These violations resulted in his eight-hour suspension without pay. In addition, the FBI and the ATF

banned Keefe from their office spaces. These bans were relied upon as part of the basis for Keefe's demotion. Moreover, Keefe was demoted only after receiving two disciplinary hearings. At its core then, Keefe's argument is that the MPD improperly steered the IA investigations in a way that contributed to some of the MPD's adverse employment actions and that his "opportunity for a name-clearing response" at his two disciplinary hearings was somehow insufficient. *See Roth*, 408 U.S. at 573. Even if true, these allegations simply do not rise to the level of conduct "inspired by malice or sadism rather than a merely careless or unwise excess of zeal [such] that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *See Moran*, 296 F.3d at 647.

Keefe next alleges that Chief Dolan's defamatory statements violated a fundamental constitutional right. Keefe points to Chief Dolan's alleged statement that "Keefe had leaked a classified investigation to black officers" and Chief Dolan's action of "intentionally instigat[ing] stories that damaged Keefe in the *StarTribune*." Keefe argues this conduct violated his fundamental constitutional rights because it impacted his employment interests. In support of his argument, Keefe cites several of our cases where a plaintiff sued his government employer for making stigmatizing statements during the course of termination. *See Mascho v. Gee*, 24 F.3d 1037, 1039 (8th Cir. 1994); *Shands v. City of Kennett*, 993 F.2d 1337, 1347 (8th Cir. 1993); *Green v. St. Louis Hous. Auth.*, 911 F.2d 65, 69 (8th Cir. 1990). Even assuming that defamation of this sort implicates a fundamental right protected by substantive due process, *see Shands*, 993 F.2d at 1347 (discussing the plaintiff's argument as a "procedural due process" claim), the conduct at issue here is not conscience shocking. Keefe was not terminated from employment at all, let alone terminated in a fashion that foreclosed his "freedom to take advantage of other employment opportunities." *See Mascho*, 24 F.3d at 1039 (quoting *Shands*, 993 F.2d at 1347). More importantly, Chief Dolan's actions did not amount to "a brutal and inhumane abuse of official power literally shocking to the conscience." *See Moran*, 296 F.3d at 647. Accordingly, construing the facts in the light most favorable to Keefe, we find that he

has failed to present a genuine dispute of material fact as to a necessary element of his § 1983 substantive due process claim—that the defendants' actions were shocking to the conscience. *See id.*

**B. Section 1986—Failure to Prevent a Conspiracy to Interfere with Civil Rights**

In order to bring a § 1986 claim for failure to prevent a conspiracy to interfere with civil rights, a plaintiff must show that (1) the defendants had actual knowledge of a § 1985 conspiracy, (2) the defendants had the power to prevent or aid in preventing the commission of the § 1985 conspiracy, (3) the defendants neglected or refused to prevent the conspiracy, and (4) a wrongful act was committed. *Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998). Accordingly, a § 1986 cause of action is dependent upon a valid § 1985 claim. *Barstad v. Murray Cnty.*, 420 F.3d 880, 887 (8th Cir. 2005). Keefe roots his claim in § 1985(3). Thus, per § 1985(3), Keefe is required to show, among other things, that there was an actual conspiracy between multiple persons, *see Barstad*, 420 F.3d at 887, and that "the conspiracy [was] fueled by some class-based, invidiously discriminatory animus," *see McDonald v. City of St. Paul*, 679 F.3d 698, 706 (8th Cir. 2012) (quoting *Andrews v. Fowler*, 98 F.3d 1069, 1079 (8th Cir. 1996)) (internal quotation marks omitted).

Assuming without deciding that Keefe has made a sufficient showing as to the other elements of a § 1985(3) claim, we hold that Keefe fails to raise a genuine dispute of material fact as to whether a conspiracy existed that was motivated by a class-based, invidiously discriminatory animus. Although it is not entirely clear, we surmise that Keefe's argument is that a § 1985 conspiracy existed among several MPD officers to influence the corruption investigation in a way that was motivated by racial animus against the four African-American officers who had been identified by the informant as corrupt. Keefe suggests that the conspirators harbored "racial animus towards Black officers" and accordingly took steps to discredit him and remove him from the task force.

Keefe fails to direct us to anything in the record showing that a conspiracy existed that was fueled by some class-based, invidiously discriminatory animus. Keefe notes that four of the six officers that the informant claimed were corrupt were African American. But the mere fact that four of the six officers investigated were African American does not raise a genuine issue of material fact that the investigation was motivated by a racially discriminatory animus. Keefe also points to several instances where Sergeant King allegedly made racist statements. Both Keefe and another MPD officer claimed to have heard Sergeant King use racial slurs. But none of the instances when Sergeant King allegedly used racial slurs appear to be related to the corruption investigation. In fact, Keefe's IA complaint against Sergeant King, which originated through a memorandum he sent to Chief Dolan, alleged that Sergeant King had used racial slurs multiple times, but Keefe's memorandum did not include any allegations that the corruption investigation was motivated by racial animus. Keefe does not refer us to anything in the record that raises a genuine dispute of material fact that Sergeant King formed an agreement with other members of the task force to influence the investigation in a way that was motivated by racial animus. Accordingly, Keefe's § 1986 claim fails.

## C. Section 1981—Retaliation

Section 1981 provides that, "[a]ll persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. A non-minority plaintiff, such as Keefe, can bring a § 1981 claim "if he is discriminated or retaliated against for attempting to 'vindicate the rights of minorities protected by' § 1981." *See Gacek v. Owens & Minor Distrib., Inc.*, 666 F.3d 1142, 1146 (8th Cir. 2012) (quoting *Sullivan v. Little Hunting Park, Inc.*, 398 U.S. 229, 237 (1969)). A prima facie claim for retaliation under § 1981 requires a showing that (1) the plaintiff engaged in statutorily protected activity, (2) an adverse employment action was taken against him, and (3) there is a causal connection between the two events. *Id.* A § 1981 claim also "must initially identify an impaired

-10-

contractual relationship under which the plaintiff has rights." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468-69 (8th Cir. 2009) (en banc) (quoting *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006)) (internal quotation marks omitted).

We analyze § 1981 claims under the same framework as Title VII claims. *Gacek*, 666 F.3d at 1146. Under this framework, if the plaintiff is able to establish a prima facie retaliation case, the defendant must provide a legitimate, nondiscriminatory reason for the employment decision. *Id.* If the defendant is able to do so, then the burden shifts back to the plaintiff to show that the proffered reason was merely a pretext for discrimination. *Id.* "To survive summary judgment, an employee must both discredit the employer's articulated reason and demonstrate the 'circumstances permit a reasonable inference of discriminatory animus.'" *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 611 (8th Cir. 2014) (en banc) (quoting *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012)), *cert. denied*, --- U.S. ---, 83 U.S.L.W. 3661 (Mar. 30, 2015) (No. 14-951). Assuming without deciding that Keefe has established a prima facie retaliation showing under § 1981, his claim nonetheless fails because he does not establish a genuine dispute of material fact that the defendants' proffered reasons for each employment action were merely pretextual.

Keefe claims that he suffered five adverse employment actions in retaliation for his attempt to vindicate the § 1981 rights of the four African-American officers under investigation. The defendants have proffered legitimate, nondiscriminatory reasons for each of these employment decisions. First, Keefe claims that his removal from the task force was retaliatory. The defendants assert that Keefe was removed because he had damaged his relationship with the FBI and the ATF, which made it impractical for him to serve as the commander of a multi-agency task force. There is no dispute that Keefe was removed from the task force only after officials from both the FBI and the ATF expressed their dissatisfaction with Keefe's behavior. Moreover, Keefe was banned from the ATF's office space. Keefe argues that "[e]ach adverse action was deliberately aimed at dissuading and discouraging Keefe's further reports and

punishing him for his previous protected conduct." But Keefe fails to cite any specific facts showing there is a genuine dispute that the defendants' articulated reason for removing him from the task force—that he had damaged his relationship with the FBI and the ATF—was merely pretextual. *See Walz*, 779 F.3d at 844. Accordingly, Keefe has failed to establish a genuine issue of material fact discrediting the defendants' articulated reason for this adverse employment action, and he thus fails to carry his burden on summary judgment. *See Securitas*, 769 F.3d at 611.

Second, Keefe argues that he suffered retaliation when he was placed on administrative leave in 2008 pending the outcome of an IA investigation. In response, the defendants assert that Keefe was placed on administrative leave after Keefe admitted that he had anonymously called Chief Dolan's wife and had not carried his gun or badge for months. Third, Keefe argues that his later eight-hour suspension in 2008 was retaliatory. The defendants again respond that Keefe was suspended because of the same admitted misconduct. Keefe admitted to this misconduct before he was placed on administrated leave and before he was suspended. Again, Keefe fails to point us to any specific facts discrediting the defendant's articulated reason for his placement on administrative leave and suspension. Therefore, Keefe cannot establish a genuine dispute of material fact that the defendants' proffered reasons were pretextual. *See id.*

Fourth, Keefe similarly argues that his placement on administrative leave in 2009 pending the outcome of the other two IA cases was retaliatory. Chief Dolan claims that he decided to place Keefe on leave because he considered Keefe to be potentially dangerous. According to Chief Dolan, his belief was based on Keefe's behavior as well as the fact that the FBI had issued a notice urging its officials to "PROCEED WITH CAUTION" if Keefe was encountered and to alert security if Keefe attempted to enter the FBI building. Keefe responds that this reason is pretextual because the "MPD, not the FBI, was responsible for the specious FBI alert on Keefe." But the record contradicts this claim. As shown by the record, an MPD

official delivered a memorandum to a Deputy Chief that included a copy of the FBI's notice and explained that the notice was "hand delivered" by an FBI agent. An electronic copy of the FBI's notice was forwarded by email to another Deputy Chief, who forwarded the email to Chief Dolan. Accordingly, Keefe again fails to raise a genuine dispute of material fact to discredit the legitimate, nondiscriminatory reason that Chief Dolan gave for his decision to place Keefe on administrative leave in 2009. *See id.*

Finally, Keefe asserts that his demotion was retaliatory. Chief Dolan decided to demote Keefe after a disciplinary panel found Keefe responsible for multiple violations of MPD policy. In case 08-010, Keefe was found responsible for being untruthful in levying allegations against other MPD officers, using racist language, being banned from the FBI's and the ATF's offices, and having inappropriate relationships with the media. And in case 09-086, Keefe was found to have violated the MPD's code of conduct as to truthfulness, ethics, and discretion. According to the defendants, the panels' findings provided Chief Dolan with a legitimate, nondiscriminatory reason to demote Keefe.

Keefe argues that his demotion was a pretext for retaliation because Chief Dolan was unfamiliar with the facts surrounding Keefe's alleged improper disclosure of a wiretap. Keefe further argues that the IA investigations were flawed, and he also challenges a disciplinary panel's finding that he was untruthful when he made statements that certain MPD officers were going to be indicted. Keefe's arguments do not undermine Chief Dolan's reliance on the disciplinary panel's findings. First, Chief Dolan was not a member of the disciplinary panels that reviewed the evidence and determined that Keefe had violated MPD policy. Accordingly, it is not surprising that Chief Dolan was not familiar with the nuances of Keefe's violations. Next, Keefe's argument that the IA investigations were flawed does not show pretext. Keefe received two disciplinary hearings where he was represented by his union. And even if the panel erred in reaching some of its conclusions, Keefe has failed to present evidence creating a genuine dispute of material fact that the MPD acted to retaliate.

Chief Dolan decided to demote Keefe only after lengthy IA investigations, two hearings in front of disciplinary panels where Keefe was represented by his union, and the panels' decisions that Keefe had violated MPD policy numerous times. The record shows that Keefe was afforded a substantial amount of process before he was demoted. We decline to act "as a super-personnel department that reexamines an entity's business decisions." *Ebersole v. Novo Nordisk Inc.*, 758 F.3d 917, 927 (8th Cir. 2014) (quoting *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 823 (8th Cir. 2005)). Keefe has failed to point to specific facts that discredit any of the defendants' proffered explanations for the various employment decisions. *See Securitas*, 769 F.3d at 611. Accordingly, Keefe has failed to show that there is a genuine issue for trial as to his § 1981 claim.

## D. *Monell* Municipal Liability

Finally, Keefe argues that the City adopted "a policy of using it[s] internal affairs division not to discipline officers, but to sanction and punish them for reports of law violations." *See generally Monell*, 436 U.S. 659. Generally, a government entity is not liable for its employee's actions under § 1983. *Brockington v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007). But a plaintiff can pursue a *Monell* claim under § 1983 by identifying a government entity's policy or custom that caused the plaintiff's injury. *Id.* Here, Keefe's *Monell* claim is dependent upon his §§ 1981 and 1983 claims. Because summary judgment is proper on those claims, Keefe's *Monell* claim also fails. *See Brockington*, 503 F.3d at 674. Accordingly, the district court did not err in granting summary judgment on Keefe's *Monell* claim.

## III.

We affirm the district court's grant of summary judgment.

_____