Brianna M. WILKERSON, Plaintiff,

v.

GREAT PRAIRIE AREA EDUCATION AGENCY, Defendant.

No. 3:14–cv–00080–JEG

United States District Court, S.D. Iowa, Davenport Division.

Signed August 28, 2015

---

Wesley T. Graham, William W. Graham, Graham Ervanian & Cacciatore, LLP, Des Moines, IA, for Plaintiff.

Matthew G Novak, Bradley J. Kaspar, Pickens Barnes & Abernathy, Cedar Rapids, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, Senior Judge

Before the Court is a Motion for Summary Judgment filed by Defendant Great Prairie Area Education Agency (GPAEA), which Plaintiff Brianna M. Wilkerson (Wilkerson) resists. The Court conducted a hearing on the motion on June 4, 2015. Attorney Wesley Graham represented Wilkerson, and attorney Matthew Novak represented GPAEA. The matter is fully submitted and ready for disposition.

## I. JURISDICTION

Wilkerson filed this action asserting a single claim against GPAEA for violation of the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601–2654. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

## II. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are either not in dispute or viewed in the light most favorable to Wilkerson. *See Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." (quoting Fed.R.Civ.P. 56(c)); *Keefe v. City of Minneapolis,* 785 F.3d 1216, 1222 (8th Cir.2015) (same).

Wilkerson began working as a full-time computer programmer for GPAEA on March 31, 2008. Wilkerson's position was a non-union, administrative support position governed by annual employment contracts that ran from July to June, which coincided with GPAEA's fiscal year. Wilkerson's annual contracts set forth Wilkerson's job title, salary, benefits, and paid leave time; the contracts also detailed that if "absence with pay is not authorized by the Administration or leave policies in effect, an amount equal to the hourly salary times the hours absent shall be deducted from the next salary payment." Wilkerson 2007–2008 Emp. Contract, Pl.'s App. 121–26, ECF No. 28–4. GPAEA Human Resources Director Greg Manske (Manske) testified that GPAEA did not have a policy for annual renewals of administrative support staff contracts and that renewal of those contracts was quite nearly automatic.

While employed at GPAEA, Wilkerson's immediate supervisor was Dr. Sally Lindgren (Dr. Lindgren). During Wilkerson's first few years of employment with GPAEA, Dr. Lindgren was satisfied with Wilkerson's work performance. Wilker-

son, similarly, spoke highly of Dr. Lindgren and stated at her deposition that Dr. Lindgren was "[t]he best boss [she has] ever had" and that Dr. Lindgren and Jane Broeg, Dr. Lindgren's secretary, were motherly-type figures to Wilkerson. Wilkerson Dep. 54:6–54:7, Def.'s App. 29, ECF No. 27–3.

On December 29, 2011, Wilkerson's car was rear ended as she pulled away from a stop sign, and she sustained a whiplash injury.[1] Wilkerson took paid sick leave from January 3, 2012, through January 13, 2012. On January 16, 2012, Dr. Lindgren and Manske met with Wilkerson to discuss Wilkerson's absences, her remaining leave time, and the likelihood Wilkerson would have insufficient leave time to cover future absences. At the January 16 meeting, Dr. Lindgren and Manske made sure Wilkerson understood that she had very little leave time remaining, expressed concern for Wilkerson's well being, and requested a medical release for her to return to work.[2] On January 20, Wilkerson obtained a return to work authorization from her chiropractor, Cynthia Grothe (Grothe), which released Wilkerson to return to work with no restrictions on January 23. Wilkerson missed work again during the week beginning Monday, January 23, and obtained another return to work authorization from Grothe on January 26, which similarly indicated Wilkerson was released to return to work without restrictions on January 26. Referring only to her own affidavit, Wilkerson asserts that after the January 16 meeting with Dr. Lindgren and Manske, undiagnosed pain in her hip, lower abdomen, and back made it difficult on good days, and impossible on bad days, to sit for long periods of time and that sitting is required to perform her duties as a computer programmer.[3] By the end of

1. Wilkerson asserts that in the car accident she also suffered lower hip and/or back injury that went undiagnosed until June 2012. Defendant admits that Wilkerson suffered whiplash but denies for lack of information that Wilkerson suffered hip or back injury in the accident. Wilkerson has not submitted medical records from her initial medical treatment following her car accident to support a diagnosis of either whiplash or lower hip/back injury. The treatment records closest in time to Wilkerson's accident are those of her chiropractor, Cynthia Grothe; those notes only indicate "chiropractic treatments." Grothe's Return to Work Notes, Pl.'s App. 128–30, ECF No. 28–4.

2. In response to Defendant's statement of undisputed facts, Wilkerson asserts that at the January 16 meeting, unpaid leave was not discussed and that GPAEA did not cap the amount of unpaid leave. In contradiction to this response, however, Wilkerson's statement of additional facts states that at the January 16 meeting, Dr. Lindgren and Manske told Wilkerson that if she ran out of leave time, she would have to take unpaid leave for absences. Wilkerson also asserts that GPAEA's January 16 request for a return to work authorization was one of many such requests; the record shows, however, that GPAEA made only three such requests: on January 16, 2012, in early March 2012, and on April 23 or 24, 2012.

3. In support of the assertion that on some days it was impossible for her to work, Wilkerson cites a note written by Dr. Alfred Savage on April 27, 2012—three months after Wilkerson's January 16 meeting with Dr. Lindgren and Manske. Dr. Savage's April 27 note, however, does not indicate Wilkerson had been undiagnosed prior to April 27 nor that Wilkerson was unable to work. In Dr. Savage's much later authored affidavit dated March 23, 2015, which was written after this litigation commenced, Dr. Savage indicated Wilkerson contacted him in June 2012 asking him to complete a FMLA certification form regarding persistent pain in her left hip area. Despite the fact that Dr. Savage was Wilkerson's treating physician, Dr. Savage deferred to an orthopedist to diagnose and treat Wilkerson for those complaints. The affidavit goes on to state that Dr. Savage "determined that an orthopedist would be best-suited to diagnosis [sic] and treat [Wilkerson], and also to determine when [Wilkerson] would likely no longer be incapacitated and able to return to work." Dr. Savage Aff. ¶ 8, Pl.'s App. 10–11, ECF No. 28–3. It also includes the dis-

January 2012, Wilkerson had used all paid leave time allowed under her contract (144 hours sick leave, 16 hours personal leave, 80 hours of vacation leave), excluding family illness leave time (64 hours).

In February 2012, Wilkerson was absent for all or part of six workdays, totaling 29.5 hours, all of which were unpaid leave. Dr. Lindgren met with Wilkerson on February 24, 2012, to discuss Wilkerson's absences and intermittent attendance, and asked Wilkerson to begin documenting her actual time worked. Wilkerson filled out handwriting attendance reports, which showed that between February 24, 2012, and April 23, 2012, Wilkerson was absent for all or part of nine workdays in March 2012, totaling 35 hours absent, and thirteen workdays in April 2012, totaling 95 hours of unpaid leave absences. Wilkerson asserts that from January 2012 through the end of April 2012, she notified GPAEA on days she was in pain and was going to be absent. [4]

On April 23 or April 24, 2012, Wilkerson spoke by telephone with Dr. Lindgren and/or Manske, who expressed concern for Wilkerson's health, asked that Wilkerson keep GPAEA informed of her progress, and informed Wilkerson that she needed to obtain medical documentation to justify her absences and that she needed another medical release to return to work. [5] Wilkerson received a note from her treating physician, Dr. Alfred Savage (Dr. Savage), on April 27, 2012, indicating that Wilkerson "has *episodes* of ovarian cyst inflammation—seeing a specialist at Iowa City"; the note indicated "episodes of missing work medically necessary." Dr. Savage's April 27 note, Def.'s App. 51, ECF No. 27–3. Dr. Savage's April 27 note, however, did not specify any particular days Wilkerson was or would be absent nor did the note indicate Wilkerson was unable to perform the functions of her job. At her deposition, Wilkerson conceded that other than Dr. Savage's April 27 note regarding Wilkerson's ovarian cyst inflammation, Wilkerson was not aware of any doctor who said she was unable to work because of any medical condition.

Wilkerson was absent from GPAEA for the entire month of May 2012. [6] Wilkerson kept GPAEA informed regarding her attempts to get a proper diagnosis so she could get treated and return to work.

On May 21, 2012, GPAEA renewed Wilkerson's contract, which provides, inter

claimer that "I could not sign [Wilkerson]'s FMLA form at that point, because I did not have a diagnosis. Instead, I referred her to an orthopedic specialist." *Id.*

4. In her statement of additional facts, Wilkerson describes that while working at GPAEA on April 13, 2012, she started experiencing extreme pain in her lower abdomen. Wilkerson was driven to the local emergency room where she was treated for dysmenorrhea (painful menstruation) and referred for follow up to a gynecologist, but despite treatment, her pain persisted. Wilkerson does not provide any medical records or physicians' statements/affidavits to verify these events; rather the events are substantiated only by Wilkerson's own affidavit.

5. Wilkerson asserts that neither Dr. Lindgren nor Manske stated that GPAEA would have

any issue with Wilkerson taking unpaid leave to address her medical issues. GPAEA denies that Dr. Lindgren or Manske ever made such a broad statement but instead that they frequently expressed concerns about Wilkerson's chronic absenteeism.

6. In her statement of additional facts, Wilkerson describes various treatment she sought and received for her persistent pain, which included referral to a surgeon who eventually ordered x-rays that did not reveal any problems, treatment by her chiropractor, and physical therapy. As with the events regarding her emergency room visit described *supra* note 4, Wilkerson failed to corroborate these events with anything more than her own affidavit.

alia, "[t]hat the Board reserves all legal rights to terminate this contract." Wilkerson, 2012–2013 Emp. Contract, Pl.'s App. 126, ECF No. 28–4. On May 24, 2012, Manske met with Wilkerson and provided Wilkerson with an FMLA application form. Wilkerson's meeting with Manske on May 24, 2014, was the first time Wilkerson had discussed or mentioned FMLA leave with GPAEA. Manske explained to Wilkerson she was required to timely complete and submit sufficient medical certification to support her request for leave due to a serious health condition. Manske further explained to Wilkerson that failure to provide complete and sufficient medical certification may result in denial of FMLA leave. Also on May 24, 2012, Dr. Lindgren advised Wilkerson she needed to complete the FMLA form or she would not have a position.[7] Wilkerson asserts this discussion with Dr. Lindgren on May 24 was the first time GPAEA threatened Wilkerson with any disciplinary action. GPAEA counters that it was Manske who suggested that Wilkerson apply for FMLA leave in order to justify her time off work and to give Wilkerson the opportunity to keep her job; however, other than Dr. Savage's April 27, 2012, nondescript, non-specific note indicating there would be "episodes of missing work medically necessary," GPAEA never received any medical documentation to support Wilkerson's work absences that occurred before June 27, 2012.

On two occasions, May 29, 2012, and June 7, 2012, Wilkerson asked Grothe to sign the FMLA form. Grothe declined to do so. Wilkerson also asked Dr. Savage to sign the FMLA form, and Dr. Savage also declined to do so. Dr. Savage provided Wilkerson a note written on a prescription form dated "6/15/12" with the names "Dr. Wenzel/Dr. Patrick or Dr. Zielinski" and an arrow pointing to the words "see in future for exam." Dr. Savage June 15, 2012, note, Pl.'s App. 150, ECF No. 28–4. Dr. Savage's note also stated, "chiropractor to fill out FMLA" and "see Dr. Dupuis Wed. 6/20/12." *Id.*

Wilkerson was absent from work for the entire month of June 2012. On June 14, 2012, Wilkerson had informed Manske she had been referred to another doctor and had an appointment on June 20, 2012; Wilkerson overslept and missed the June 20th appointment. The appointment was rescheduled for June 27, 2012. On June 27, 2012, Wilkerson was examined by Dr. Jerry Jochims. Dr. Jochims' examination notes indicate Wilkerson was being seen for low back pain, and based upon palpation of the affected area and a review of Wilkerson's lumbar x-ray, which revealed normal findings, Dr. Jochims discussed treatment options, including a trigger point injection for what Dr. Jochims considered to be "myofascitis" (inflammation of the muscle and its fascia). Dr. Jochims gave Wilkerson the trigger point injection, advised her to document her symptoms, and to follow up with him in two weeks. Dr. Jochims provided Wilkerson with a return to work authorization, which indicated Wilkerson could return to work half

---

7. In her statement of additional facts, Wilkerson asserts neither Mankse nor Dr. Lindgren walked her through the form to explain how or when the form needed to be completed. Wilkerson's deposition testimony, however, contradicts this assertion. At her deposition, Wilkerson admitted it was her handwriting and signature on Section II of the FMLA form and that she knew the FMLA form required that she "submit a timely complete and suffi-

cient medical certification to support [her] request for FMLA leave due to [her] own serious medical condition" and that "failure to provide a complete and sufficient medical certification m[ight] result in a denial of [her] FMLA [leave]." Wilkerson Dep. 19:25–20:3, Pl.'s App. 15, ECF No. 28–3. Wilkerson further admitted that Manske had also given her those instructions on May 24.

days on July 2, 2012, and that Wilkerson was expected to be restored to full duty in a couple weeks after Wilkerson returned for her follow up examination. Dr. Jochims did not complete an FMLA form at that time. According to Wilkerson and supported only by her own affidavit, Dr. Jochims' office told Wilkerson Dr. Jochims would complete the FMLA form and fax it to GPAEA.

On June 28, 2012, Manske sent an email to GPAEA's attorney, Richard Gaumer, which stated as follows:

> Sally Lindgren and I have put together a document summarizing the events that have *led us to the conclusion to terminate Ms. Wilkerson* .... In addition to the habitual absences, Dr. Lindgren has determined [Ms. Wilkerson] has accomplished very little while on the job. We have given her every opportunity to correct her situation to no avail.

June 28, 2012, Manske email to Gaumer, Def.'s App. 57, ECF No. 27–3. As of June 28, 2012, the only forms GPAEA received from Wilkerson's medical providers were the January 20 and January 26, 2012, from Grothe releasing Wilkerson to work on January 23 and January 26, 2012, respectively, and the April 27, 2012, note from Dr. Savage indicating that Wilkerson "has *episodes* of ovarian cyst inflammation—

seeing a specialist at Iowa City" with the nonspecific indication that "episodes of missing work medically necessary." Dr. Savage's April 27 note, Def.'s App. 51, ECF No. 27–3.

After Wilkerson's examination on June 27, Dr. Jochims provided Wilkerson with a return to work note, which Wilkerson submitted to GPAEA.[8] It is undisputed that Wilkerson did not submit the required FMLA form to GPAEA on June 27.

On July 2, 2012, Wilkerson attempted to return to work for the first time since April 2012. Manske informed Wilkerson that GPAEA had not received any FMLA form and sent Wilkerson home. Manske also advised Wilkerson that GPAEA's attorney had been contacted about terminating Wilkerson and that he would give Wilkerson a call after GPAEA heard back from the attorney. After leaving GPAEA, Wilkerson confirmed with Dr. Jochims' office that the FMLA form had not been completed and thus had not been sent to GPAEA. Later that day, Wilkerson picked up the completed FMLA form from Dr. Jochims' office, returned to GPAEA, and submitted the FMLA form.

In Section III of the FMLA form, Dr. Jochims described the condition for which Wilkerson sought future leave as "low

---

8. GPAEA denies that Wilkerson submitted the note on June 27 and points to the deposition testimonies of both Manske and Dr. Lindgren, who each state they had no knowledge of receiving the June 27 return to work note. Dr. Lindgren did qualify her response noting that Wilkerson tended to occasionally stop by the GPAEA office for various reasons and when she did so, Wilkerson would stop into Dr. Lindgren's office to chat and so acknowledges that the June 27 conversation could have taken place but that she had no specific recollection of a conversation with Wilkerson on June 27. Additionally, both Manske and Dr. Lindgren conceded that on June 27, they were aware Wilkerson's planned to return to work part time on Monday, July 2, 2012.

Wilkerson's Appendix includes a June 27, 2012, text message exchange between Wilkerson and Jane Broeg in which Wilkerson mentions getting the note from Dr. Jochims releasing her to work part time beginning July 2, 2012, and that she had been into the GPAEA office to talk with Manske and Dr. Lindgren that day. The messages do not indicate Wilkerson submitted the return to work note to GPAEA, only that Wilkerson discussed the part time schedule with Manske and Dr. Lindgren.

Viewing this fact in the light most favorable to Wilkerson, for purposes of summary judgment, the Court accepts that Wilkerson submitted Dr. Jochims' note to GPAEA on June 27, 2012.

back pain from automobile accident 12/29/11" and answered the following questions:

Question: "Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?"

Response: "No."

Question: "Date(s) [the medical provider] treated the patient for condition?"

Response: "6/27/2012."

Question: "Will the patient need to have treatment visits at least twice per year due to the condition?"

Response: "No."

Question: "Was medication, other than over-the-counter medication, prescribed?"

Response: "No."

Question: "Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?"

Response: "No."

Question: "Is the medical condition pregnancy?"

Response: "No."

Question: "Is the employee unable to perform any of his/her job functions due to the condition?"

Response: "No." [9]

Question: "Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave...."

Response: "[L]ow back pain from automobile accident 12/29/11."

Question: "Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery?"

Response: "Yes."

Question: "If so, estimate the *beginning and ending dates* for the period of incapacity?"

Response: "7/2/12—next app 7/12/12."

Question: "Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition?"

Response: "Yes."

Question: "If so, are the treatments or the reduced number of hours of work medically necessary?"

Response: "Yes."

Question: "Estimate treatment schedule, if any, including the dates of any scheduled appointments...."

Response: "next appt 7/12/12"

Question: "Estimate the part-time or reduced work schedule the employee needs ...."

Response: "4 hours per day; 5 days per week from 7/2/12 through 7/12/12."

Question: "Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions?"

Response: "N/A."

Question: "Is it medically necessary for the employee to be absent from work during the flare-ups?"

Response: "N/A."

Question: "Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1–2 days):"

Response: "N/A."

---

9. The next question asked, "If so, identify the job functions the employee is unable to perform." Dr. Jochims did not answer the question because he answered "no" to the previous question.

FMLA form dated July 2, 2012, Def.'s App. 46–47, ECF No. 27–3 (emphasis added). The "additional information" portion of Section III indicated Wilkerson could "[r]eturn to work half days starting 7/2/12." *Id.* The form was dated July 2, 2012, and bore Dr. Jochims' stamped signature. *Id.* The July 2, 2012, form did not address Wilkerson's work absences prior to June 27, 2012. *Id.* Wilkerson admits she did not complete nor submit to GPAEA any other FMLA forms.

On July 9, 2012, after receiving the response from its attorney and obtaining the signature of Chief Administrator Dr. Jon Sheldahl, GPAEA delivered Wilkerson her formal notice of termination. The Notice of Termination, in relevant part, states the following:

> The recommendation to terminate your contract is being made because of chronic absenteeism that is not documented as medically necessary by a licensed healthcare provider. Specifically, you did not return the "Certification of Health Care Provider for Employee's Serious Health Condition" form (Family Medical Leave Act) as requested on May 24, 2012.

July 9, 2012, Notice of Termination, Def.'s App. 58, ECF No. 27–3.

Wilkerson filed this action against GPAEA on July 3, 2014, alleging GPAEA violated the FMLA by denying Wilkerson qualified leave and discharging her for seeking to obtain FMLA leave. GPAEA filed this motion on March 4, 2015, asserting it is entitled to summary judgment because there are no genuine issues of material fact that Wilkerson did not meet the statutory requirements to qualify her for leave as she was able to perform her job functions; GPAEA further argues that Wilkerson was terminated for chronic absenteeism, which is a legitimate, non-retaliatory reason and that there is no credible evidence GPAEA discharged Wilkerson

because of her attempt to exercise FMLA rights. Wilkerson resists, arguing the FMLA form she submitted was sufficient and even if it was not, GPAEA failed to give her the opportunity to cure perceived deficiencies; GPAEA denied her FMLA leave to which she was entitled; and GPAEA retaliated against her for attempting to exercise her rights under the FMLA.

## III. DISCUSSION

### A. Summary Judgment Standard

"Summary judgment is proper when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hudson v. Tyson Fresh Meats, Inc.,* 787 F.3d 861, 865 (8th Cir.2015) (quoting Fed.R.Civ.P. 56(a)). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott,* 550 U.S. at 380, 127 S.Ct. 1769 (quoting Fed.R.Civ.P. 56(c)). "Self-serving affidavits do not defeat a 'properly supported motion for summary judgment.' Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davis v. Jefferson Hosp. Ass'n,* 685 F.3d 675, 680 n. 2 (8th Cir.2012) (quoting *Frevert v. Ford Motor Co.,* 614 F.3d 466, 473–74 (8th Cir.2010)). "There is no discrimination-case exception to a district court's power to grant summary judgment." *Ebersole v. Novo Nordisk, Inc.,* 758 F.3d 917, 923 (8th Cir.2014) (citing *Torgerson v. City of Rochester,* 643 F.3d 1031, 1043 (8th Cir.2011) (en banc)).

### B. FMLA

The FMLA "provides job security to employees who must miss work because of their own illnesses, to care for family members, or to care for new babies. The

FMLA provides eligible employees up to 12 workweeks of unpaid leave during any 12–month period." *Stallings v. Huss-mann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2612)(e)(2)). The Eighth Circuit

> recognize[s] three types of claims arising under two subsections of the FMLA dealing with prohibited acts, 29 U.S.C. § 2615(a)(1), (a)(2):
>
> (1) "entitlement" claims, *see Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir.2012), or "interference" claims, arising under § 2615(a)(1);
>
> (2) "retaliation" claims, arising under § 2615(a)(2), *see Pulczinski*, 691 F.3d at 1005–06; *Lovland v. Emp'rs Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir.2012); and
>
> (3) "discrimination" claims, arising under § 2615(a)(1), *see Pulczinski*, 691 F.3d at 1006; *cf. Lovland*, 674 F.3d at 811.

*Brown v. City of Jacksonville*, 711 F.3d 883, 890–91 (8th Cir.2013).[10]

In resistance to GPAEA's motion for summary judgment, Wilkerson indicated that she was asserting "both interference and retaliation claims under the FMLA."

10. Wilkerson asserts there is a "dispute" within the Eighth Circuit as to whether there are two or three types of FMLA claims. *See* Pl.'s Br. 7. *Compare Pulczinski*, 691 F.3d at 1005 ("This court has recognized *three* types of claims arising under these two subsections": first, an interference or entitlement claim arising under § 2615(a)(1); second, a retaliation claim arising under § 2615(a)(2); and third, a discrimination claim arising under § 2615(a)(1) (emphasis added)), *with Ebersole*, 758 F.3d at 923 ("We recognize *two* types of claims under the FMLA: interference and retaliation claims." (emphasis added) (citing *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 958 (8th Cir.2012)).

There are no court decisions relying on *Ebersole* for the proposition that there are (only) two claims under the FMLA; in contrast, *Pulczinski* is cited in several Eighth Circuit opinions as well as in numerous district court orders for the proposition that the Eighth Circuit recognizes three types of claims under the FMLA. *See, e.g., Burciaga v. Ravago Americas LLC*, 791 F.3d 930, 934, n. 2 (8th Cir.2015) ("There are two types of claims under § 2615(a)(1), entitlement claims and discrimination claims" and "[a] third type of FMLA claim, a 'retaliation' claim, exists under § 2615(a)(2)."); *Hudson*, 787 F.3d at 865 & n. 2 (same); *Brown*, 711 F.3d at 890–91 (same); *Johnson v. Wheeling Mach. Prods.*, 779 F.3d 514, 517 (8th Cir.2015) ("We have recognized three categories of FMLA claims arising under 29 U.S.C. § 2615(a)(1)–(2)...."); *Eason v. Walgreen Co.*, No. CIV. 13-3184 ADM/SER, 2015 WL 4373656, at *4 (D.Minn. July 15, 2015) ("The Eighth Circuit

recognizes three types of claims arising under the FMLA."); *Hernandez v. Bridgestone Americas Tire Operations, LLC*, 97 F.Supp.3d 1062, 1069–70, 2014 WL 8514736, at *5 (S.D.Iowa 2014); *Doering v. Wal-Mart Stores, Inc.*, Civil No. 12-2629 (JRT/LIB), 2014 WL 3395745, at *14 (D.Minn. July 11, 2014); *Brown v. Diversified Distrib. Sys., LLC*, No. CIV. 13-218 ADM/LIB, 2014 WL 2718760, at *6 (D. Minn. June 16, 2014) (same); *Perry v. Lancaster Cnty., Neb.*, No. 4:13CV3013, 2014 WL 2574523, at *11 (D.Neb. June 9, 2014) (same); *Peterson v. HealthEast Woodwinds Hosp.*, No. CIV. 12-327 JNE/FLN, 2013 WL 2420457, at *3 (D.Minn. June 3, 2013) (same); *Hill v. Walker*, No. 5:12CV00016 JLH, 2012 WL 4792738, at *1 (E.D.Ark. Oct. 9, 2012) (same), *aff'd*, 737 F.3d 1209 (8th Cir.2013).

In stating there are two claims under the FMLA, the *Ebersole* court cites the *pre-Pulczinski* case, *Bone v. G4S Youth Servs., LLC*, 686 F.3d at 958, but did not cite *Pulczinski* let alone take issue with *Pulczinski* having established that the Eighth Circuit now recognizes three, as opposed to two, claims under the FMLA. It appears to be through mere inadvertence the *Ebersole* court cited *Bone*, a *pre-Pulczinski* case, when stating that there are two claims under the FMLA. Nevertheless, to the extent there is a dispute, *Pulczinski* preceded *Ebersole* and established that there are three types of claims under the FMLA; the Court must follow *Pulczinski. See Maxfield v. Cintas Corp., No. 2*, 487 F.3d 1132, 1135 (8th Cir.2007) ("[T]he 'prior panel rule'—provides that one panel of this court has no authority to overrule an earlier decision of another panel.").

Pl.'s Br. 7, ECF No. 28. To be in accord with *Pulczinski,* however, Wilkerson's FMLA claims must be reclassified.

The *Pulczinski* court clarified that the first FMLA claim

arising under § 2615(a)(1), occurs where an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act. An employee proceeding on this theory need not show that an employer acted with discriminatory intent. Our cases sometimes describe this type of claim as an 'interference' claim, but that terminology may not illuminate, because *all* prohibited acts under § 2615(a) appear under the heading 'Interference with rights.' For clarity of analysis, we think it helpful to describe this as an 'entitlement' claim—an employee claims the denial of a benefit to which he is entitled under the statute.

*Pulczinski,* 691 F.3d at 1005 (citations omitted).

Next, the *Pulczinski* court distinguished that a FMLA retaliation claim

arising under § 2615(a)(2) is analogous to retaliation claims that are familiar under Title VII and other federal anti-discrimination statutes . . . . [and occurs, for example, where] an employee opposes any practice made unlawful under the FMLA—for example, if an employee complains about an employer's refusal to comply with the statutory mandate to permit FMLA leave—then the employer may not for that reason take adverse action against the employee who is engaged in the opposition. As under Title VII, this claim is naturally described as a "retaliation" claim.

*Id.* at 1005–06 (citations omitted).

Finally, regarding the third type of FMLA claim, the *Pulczinski* court pronounced that discrimination

arises when an employer takes adverse action against an employee because the employee exercises rights to which he is entitled under the FMLA. In this scenario, the employer does not prevent the employee from receiving FMLA benefits. Rather, it is alleged that after the employee exercised his statutory rights, the employer discriminated against him in the terms and conditions of employment. An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA. . . . [T]he claim likely arises under the rule of § 2615(a)(1) that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" rights defined by the FMLA. To distinguish the "entitlement" claim under § 2615(a)(1), and the "retaliation" claim under § 2615(a)(2), we think it helpful to describe this sort of complaint as a "discrimination" claim.

*Id.* at 1006 (citations omitted).

Wilkerson makes the following allegations in paragraphs seven through eleven of her complaint:

7. On or about May 24, 2012, and prior thereto, Plaintiff requested leave under the provisions of the Family Medical Leave Act for a serious health condition affecting her. The last leave was requested May 24, 2012.

8. Plaintiff's need for leave was not foreseeable.

9. On May 24, 2012, Defendant notified Plaintiff it would require medical certification to support her request for leave.

10. Plaintiff provided the requested certification on July 2, 2012.

11. Plaintiff was discharged from her employment on July 9, 2012.

Compl. 2, ECF No. 1. Based on these allegations, Wilkerson does not allege that GPAEA took "adverse action against

[her]" for "complain[ing] about [GPAEA]'s refusal to comply with the statutory mandate to permit FMLA leave" or for "oppos[ing] any practice made unlawful under the FMLA," *Pulczinski*, 691 F.3d at 1005–06; therefore Wilkerson's claim is not a retaliation claim arising under § 2615(a)(2). Wilkerson's counsel confirmed at the June 4, 2015, hearing that her allegations are that GPAEA refused to authorize leave under the FMLA and that after exercising her FMLA rights, GPAEA discriminated against Wilkerson in the terms and conditions of employment. Under the *Pulczinski* analysis, Wilkerson's claims are more appropriately construed as an entitlement claim and/or discrimination claim arising under § 2615(a)(1) of the FMLA. *See id.*

### C. Entitlement Claim

■ To succeed on her entitlement claim, Wilkerson "must establish that [s]he was, in fact, entitled to FMLA leave. . . ." *Johnson*, 779 F.3d at 518.

#### 1. FMLA Form

GPAEA first argues the FMLA form Wilkerson submitted, on which Dr. Jochims indicated Wilkerson was able to perform her job functions, did not meet the statutory requirements to qualify Wilkerson for leave, and therefore Wilkerson's claim fails as a matter of law. Wilkerson counters that the form is sufficient and complete as it states that she would be incapacitated for a single continuous period of time due to her serious health condition; in the alternative, Wilkerson argues that even if the form was insufficient or incomplete, GPAEA failed to give her the required opportunity to cure any perceived deficiencies. GPAEA counters that Wilkerson submitted the form on July 2, 2012, 39 days after having received the form from GPAEA on May 24, which was well beyond the 15–day submission requirement; thus, under the facts of this case,

the form was untimely and Wilkerson had no right to cure. GPAEA argues, moreover, that Wilkerson did not qualify for FMLA leave as Dr. Jochims indicated Wilkerson was able to perform her job functions.

The regulation that governs FMLA certification is 29 C.F.R. § 825.305(a)–(d), which, in relevant part, states the following:

(a) General. *An employer may require that an employee's leave . . . due to the employee's own serious health condition that makes the employee unable to perform one or more of the essential functions of the employee's position, be supported by a certification issued by the health care provider of the employee . . . . An employer must give notice of a requirement for certification each time a certification is required . . . .*

(b) Timing. In most cases, the employer should request that an employee furnish certification at the time the employee gives notice of the need for leave or within five business days thereafter, or, in the case of unforeseen leave, within five business days after the leave commences. *The employer may request certification at some later date if the employer later has reason to question the appropriateness of the leave or its duration. The employee must provide the requested certification to the employer within 15 calendar days after the employer's request, unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts or the employer provides more than 15 calendar days to return the requested certification.*

(c) Complete and sufficient certification. The employee must provide a complete and sufficient certification to the employer if required by the employer. . . . The employer shall advise an employee

whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient. A certification is considered incomplete if the employer receives a certification, but one or more of the applicable entries have not been completed. A certification is considered insufficient if the employer receives a complete certification, but the information provided is vague, ambiguous, or nonresponsive. The employer must provide the employee with seven calendar days (unless not practicable under the particular circumstances despite the employee's diligent good faith efforts) to cure any such deficiency. If the deficiencies specified by the employer are not cured in the resubmitted certification, the employer may deny the taking of FMLA leave, in accordance with § 825.313. *A certification that is not returned to the employer is not considered incomplete or insufficient, but constitutes a failure to provide certification.*

(d) Consequences. At the time the employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification. If the employee fails to provide the employer with a complete and sufficient certification, despite the opportunity to cure the certification as provided in paragraph (c) of this section, or fails to provide any certification, the employer may deny the taking of FMLA leave, in accordance with § 825.313. *It is the employee's responsibility either to furnish a complete and sufficient certification or to furnish the health care pro-*

*vider providing the certification with any necessary authorization from the employee ... in order for the health care provider to release a complete and sufficient certification to the employer to support the employee's FMLA request.* This provision will apply in any case where an employer requests a certification permitted by these regulations, whether it is the initial certification, a recertification, a second or third opinion, or a fitness for duty certificate, including any clarifications necessary to determine if such certifications are authentic and sufficient. *See* §§ 825.306, 825.307, 825.308, and 825.312.

(emphasis added).

### a. Timeliness and Sufficiency of the FMLA Form

 GPAEA argues that Wilkerson's claim is premised exclusively on the FMLA form Wilkerson submitted to GPAEA on July 2, 2012. GPAEA points out that on that form Dr. Jochims indicated Wilkerson was not unable to perform any of her job functions due to her condition. Wilkerson concedes that Dr. Jochims did not certify that her condition prevented her from performing her job functions but insists that it is inconsequential given that Dr. Jochims did certify that Wilkerson would be unable to perform her work duties full time for at least two weeks. Wilkerson further qualifies that Dr. Jochims necessarily focused on the amount of leave Wilkerson needed going forward as Dr. Jochims had seen Wilkerson for the first time on June 27, 2012, and therefore could not complete any portion of the form related to Wilkerson's past absences.[11] Yet, Wilkerson goes on to argue that Dr. Jochims completed the

---

11. Wilkerson cites *Thorson v. Gemini, Inc.,* 998 F.Supp. 1034, 1038–39 (N.D.Iowa 1998) (finding that under the facts of the case, which included a medical doctor having examined the employee at least twice, prescribed medication, ordered further testing, and told her not to return to work, the employee had demonstrated a genuine issue of fact regarding whether she was able to per-

FMLA certification so that Wilkerson could return to work with certain, temporary restrictions.

Wilkerson's acknowledgment that Dr. Jochims indicated she could return to work with temporary restrictions directly contradicts Wilkerson's assertion that Dr. Jochims implied Wilkerson was *previously* incapacitated. Wilkerson attempts to rectify this contradiction by asserting that the fact "[t]hat Dr. Jochims certified Plaintiff's needed leave—as opposed to her past incapacity—also makes sense given that [Wilkerson] understood, based on the lack of direction from Manske and [GPAEA]'s past practices of requiring return to work authorizations, that [GPAEA] required the FMLA form to be completed in order for her to return to work." Pl.'s Br. 9, ECF No. 28. This is an inaccurate representation of the record. Neither Dr. Jochims' June 27 return to work note nor the subse-

quently submitted FMLA form states that Wilkerson was incapacitated prior to June 27, nor do either of those documents substantiate Wilkerson's absences in the four months prior to that exam. Wilkerson's future temporary work restrictions were a result of Dr. Jochims' examination and treatment on June 27, which included a trigger point injection, and do not support the inference Wilkerson proposes. Wilkerson's speculation about Dr. Jochims' answers notwithstanding, as the FMLA form instructs, Dr. Jochims' answers were to be based upon his "medical knowledge, experience, and examination of [Wilkerson]," *see* Wilkerson FMLA Cert. Form, Def.'s App. 45, ECF No. 27–3, and not, as Wilkerson suggests, upon *Wilkerson's* subjective understanding of what responses were necessary. Accordingly, Dr. Jochims' responses must be read independent of Wilkerson's conjecture. [12]

form the functions of her job due to her serious health condition within the meaning of 29 U.S.C. § 2612(a)(1)(D)), for the proposition that it is inconsequential that Dr. Jochims did not certify that Wilkerson's condition prevented her from performing her job functions given Dr. Jochims' certification under Part B of Section III that focused on Wilkerson's need for leave going forward since he saw Wilkerson for the first time on June 27, 2012, and could not complete any portion of the form related to Wilkerson's past absences. *Thorson* is distinguishable because in the present case, Dr. Jochims never indicated Wilkerson could not perform the functions of her job as did the doctor in *Thorson*.

12. Wilkerson cites *Parsons v. Principal Life Insurance Co.*, 686 F.Supp.2d 906, 910 (S.D.Iowa 2010), for the proposition that contradictions on an FMLA form support an inference that answers on the form were in error. In *Parsons*, the employer determined that the health care provider's certification was incomplete because while the provider indicated that the plaintiff suffered from a serious health condition from which the plaintiff would have a period of incapacity that would last for one month and that the plaintiff could not perform work of any kind,

including the functions of her position, the provider did not identify the employee's medical condition or a treatment plan, and answered "no" to the question whether it was necessary for the plaintiff to be absent from work for treatment. *Id.* at 913 & n. 2. The *Parsons* court reasoned that while the response certainly entitled the employer to request more complete information, "it [wa]s a reasonable inference that the response was in error, given all the other information on the form indicating that Plaintiff was unable to work due to a serious health condition." *Id.*

Wilkerson argues that because Dr. Jochims certified that Wilkerson was incapacitated from her "low back pain" and initially checked "yes" to the question whether Wilkerson was unable to perform any of her job functions before he scribbled it out and checked "no," it is reasonable to infer that the response was in error. Pl.'s Br. 11, ECF No. 28. The inference allowed in *Parsons* is unwarranted in this case. Unlike the provider in *Parsons*, in this case, Dr. Jochims did not omit critical information regarding Wilkerson's medical condition nor did he omit Wilkerson's treatment plan. There is nothing contradictory about Dr. Jochims' answers on the FMLA form. Had Dr. Jochims intended to

Wilkerson's next contention is that if she had been instructed to complete the form to cover prior absences she would have explained as much to her chiropractor (Grothe) or to Dr. Savage, instead of telling them that she needed the form completed in order to return to work. Again, the record fails to support Wilkerson's assertion. First, the purpose of the FMLA form is clearly listed on the face of the form. Section II of the form, which is to be completed by the employee, states that "[t]he FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification *to support a request for FMLA leave* due to your own serious health condition. If requested by your employer, your response is required *to obtain or retain the benefit of FMLA protections*." Wilkerson FMLA form, Def.'s App. 45, ECF No. 27–3 (emphasis added). Second, Wilkerson admits that after the May 24 meeting when Dr. Lindgren and Manske instructed her to have the FMLA form completed, Wilkerson presented the FMLA form to both Grothe and Dr. Savage but both of them refused to complete it. Third, the record shows that when GPAEA asked for return to work authorization, GPAEA accepted such authorization written on Grothe's own stationery and did not require a special form. Thus, Wilkerson's subjective belief that GPAEA requested the FMLA form as a return to work authorization is not supported by the record. Fourth, Wilkerson admitted at her deposition that Manske went over the FMLA form with Wilkerson on May 24. *See* Wilkerson Dep. 19:25–20:3, Pl.'s App. 15, ECF No. 28–3. Furthermore, Wilkerson's admission that "on May 24th, Lindgren told [Wilkerson] that

she needed to complete the FMLA form in order for [Wilkerson] to *retain her job*, which was *the first time* that [GPAEA] threatened [Wilkerson] with any disciplinary action," Pl.'s Br. 3, ECF No. 28 (emphasis added), belies Wilkerson's later assertion that it was her understanding "based on the lack of direction from Manske and [GPAEA]'s *past practices* of requiring return to work authorizations, that [GPAEA] required the FMLA form to be completed in order for her to return to work." *Id.* at 10 (emphasis added). Wilkerson cannot contend that GPAEA requesting the FMLA form and advising Wilkerson of the consequences of failing to submit it was *new* conduct, while simultaneously contending that in making this request, GPAEA was merely repeating its *previous* conduct of requesting a return to work authorization.

It is undisputed that on May 24 Manske presented Wilkerson with the FMLA leave form to provide medical certification to support Wilkerson's leave due to a serious health condition and advised Wilkerson of the consequences of failing to submit the form; Dr. Lindgren reinforced this information. It is also undisputed that Wilkerson did not submit the requested FMLA form until July 2. The FMLA form was not timely submitted to GPAEA as required under the Act, and therefore Wilkerson's absence from May 24 through July 2 constituted unauthorized leave. Moreover, the FMLA form that Wilkerson ultimately submitted did not demonstrate that Wilkerson had been suffering from a serious health condition. *See* 29 U.S.C. § 2611 ("The term 'serious health condition' means an illness, injury, impairment, or

answer "yes" to the question of whether Wilkerson was unable to perform her job functions, Dr. Jochims would have necessarily answered the follow up question. Dr. Jochims did not answer the question, but instead, consistent with his answer to the previous ques-

tion, he left the follow-up question blank. Moreover, releasing Wilkerson to return to work half days is entirely consistent with Dr. Jochims' answer that Wilkerson was able to perform her job functions.

physical or mental condition that involve—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider."); *Dalton v. ManorCare of W. Des Moines IA, LLC,* 782 F.3d 955, 962 (8th Cir.2015) ("Where absences are not attributable to a serious health condition ... FMLA is not implicated and does not protect an employee against disciplinary action based upon such absences." (alteration in original) (quoting *Rankin v. Seagate Tech., Inc.,* 246 F.3d 1145, 1147–48 (8th Cir.2001))); *Frazier v. Iowa Beef Processors, Inc.,* 200 F.3d 1190, 1195 (8th Cir. 2000) (finding that the employee who was terminated for absences related to his shoulder injury could not establish that he received "continuing treatment" by a health care provider, as required to prevail on his FMLA claim because neither of the employee's visits to physicians resulted in a program of treatment, prescribed medication, nor a course of physical therapy, and the employee failed to return for his scheduled follow-up visits with physicians).

### b. Cure

Wilkerson argues alternatively, if the FMLA certification is insufficient or incomplete, GPAEA was required under 29 C.F.R. § 825.305 to give her an opportunity to cure the deficiencies. The circumstances allowing an employee to cure are not present here.

■ The FMLA form Wilkerson submitted on July 2, 2012, was neither insufficient nor incomplete as defined under the regulations. Dr. Jochims responded to all the questions, he listed Wilkerson's medical condition and treatment plan, he indicated that Wilkerson could perform the functions of her job, and he authorized Wilkerson to return to work half days for two weeks with a return to full days expected after her follow up examination two weeks later. These responses are not vague, ambiguous, or non-responsive. In

addition, Wilkerson asserts both Grothe and Dr. Savage refused to complete the FMLA form and that because Dr. Jochims saw Wilkerson for the first time on July 27, Dr. Jochims could not address Wilkerson's past absences. These reasons do not make the FMLA form insufficient or incomplete as defined by the regulations; rather, these reasons demonstrate that those medical professionals, although qualified to substantiate Wilkerson's absences between May 24 and July 2, would not or could not substantiate the basis for FMLA leave during that time period. *See Frazier,* 200 F.3d at 1195 (noting that in dismissing the plaintiff's FMLA claim, the district court correctly observed that although the plaintiff saw two doctors for treatment of a shoulder injury, those "medical records were completely devoid of any evidence that [the plaintiff] was instructed by either doctor that his shoulder injury was of such severity as to make him unable to perform his job").

Wilkerson cites *Blair v. Wilson Trailer Co.,* No. 10–CV–04126–DEO, 2012 WL 2989661, at *8 (N.D.Iowa July 20, 2012) in support of her contention that GPAEA was required to provide her the opportunity to cure the deficiencies in the FMLA form. The facts present in *Blair* are remarkably distinguishable from the present case. In *Blair,* the healthcare provider despite repeated attempts by the healthcare provider to clarify vague or incomplete answers on the FMLA form, the employer repeatedly denied FMLA leave without informing the employee (or the healthcare provider's representative that repeatedly contacted the employer) what was insufficient about the FMLA form or why FMLA leave had been denied. Here, Dr. Jochims' responses, namely that Wilkerson was able to perform the functions of her job, demonstrate that Wilkerson did not qualify for FMLA leave. Accordingly, unlike the plaintiff in *Blair,* Wilkerson's

form was not insufficient; GPAEA was not required to provide Wilkerson with a written explanation.

Finally, for the proposition that because GPAEA did not set a deadline for Wilkerson to return the form, her form was timely submitted on July 2, Wilkerson cites *Michener v. Bryanlgh Health Sys.*, No. 4:08CV3202, 2009 WL 2840530, at *1 (D.Neb. Aug. 31, 2009), wherein the district court denied the employer's motion for summary judgment reasoning there were genuine issues of material fact whether the employer notified the employee that medical certification was required or of the consequences of failing to timely return the certification. *Michener* is distinguishable from the present case as it is undisputed that Wilkerson was told that she needed to submit the FMLA documentation to retain her position.

GPAEA gave Wilkerson the FMLA form on May 24, and Wilkerson did not return it until 39 days later on July 2. According to Wilkerson, on two occasions, May 29, 2012, and June 7, 2012, Wilkerson asked her healthcare providers, Grothe and Dr. Savage, to sign the FMLA form and both of them declined to do so. Dr. Savage did provide Wilkerson with a note on June 15, 2012, that she was to see Dr. Wenzel, Dr. Patrick, or Dr. Zielinski for a future for exam; there is no indication Wilkerson ever saw any of those providers. When Wilkerson was referred to another doctor and scheduled for an appointment on June 20, 2012, Wilkerson overslept and missed the appointment. These facts do not constitute a diligent or good faith effort on Wilkerson's part in seeking to obtain certification for her continued work absences. *See Crane v. Gore Design Completion, Ltd.*, 21 F.Supp.3d 769 (W.D.Tex. 2014) ("[C]ourts denying equitable tolling

have done so where an employee only followed up with his doctor after the 15–day deadline had passed.").

Wilkerson failed to establish that she was entitled to FMLA leave, and therefore GPAEA is entitled to summary judgment on Wilkerson's FMLA entitlement claim. *Johnson*, 779 F.3d at 518.

### D. FMLA Discrimination Claim

 FMLA discrimination claims are analyzed "under the *McDonnell Douglas*[13] burden-shifting framework that is applied in Title VII cases." *Pulczinski*, 691 F.3d at 1007. "To establish a prima facie case of FMLA discrimination, an employee must show: (1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action. *Id.* "An employee making this type of claim must prove that the employer was motivated by the employee's exercise of rights under the FMLA." *Id.* at 1006. "[A]n employee must prove that his exercise of FMLA rights 'played a part' in the employer's decision." *Id.* at 1007.

### 1. Prima Facie Case

GPAEA concedes Wilkerson suffered an adverse employment action but argues that Wilkerson nonetheless fails to establish a prima facie case of FMLA discrimination because Wilkerson did not engage in a protected activity and there was no causal connection between the alleged protected activity and her adverse employment action. The Court must agree.

---

13. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

### a. Protected Activity

■ Wilkerson cannot show she engaged in a protected activity. Wilkerson failed to provide the requisite certification from a health care provider indicating she was unable to perform the functions of her job; therefore, the leave she took was not under the auspices of the FMLA. *See, e.g., Cash v. Smith*, 231 F.3d 1301, 1307 (11th Cir.2000) ("[Plaintiff] has failed to present evidence that she exercised a protected right under the FMLA. [Defendant] requested that [Plaintiff] have her doctor complete the company's standard FMLA certification form, and [Plaintiff]'s personal physician indicated on the form that [Plaintiff] did not qualify for FMLA leave because her conditions were being controlled by medication, and she was able to perform the functions of her position. [Plaintiff] did not provide [Defendant] with certification that her medical conditions met the statutory standard, and therefore the medical leave that she did take was not under the auspices of the FMLA.").

Wilkerson counters that the FMLA protects employees not just when they exercise their rights under the Act, but also when they attempt to exercise their rights under the FMLA. Other than GPAEA's determination Wilkerson's FMLA certification did not meet the statutory standard, Wilkerson does not explain how GPAEA otherwise interfered with Wilkerson's attempt to exercise her FMLA rights. Wilkerson has failed to show she engaged in protected activity, and therefore she cannot demonstrate a prima facie case of discrimination.

### b. Causal Connection

■ Even assuming Wilkerson's FMLA form submitted on July 2 constituted a protected activity under the FMLA, Wilkerson failed to demonstrate GPAEA terminated her for attempting to exercise her FMLA rights by requesting the leave required by Dr. Jochims.

Wilkerson asserts that after she provided GPAEA a return to work authorization indicating she would be returning to work on July 2, 2012, half days for at least two weeks, GPAEA decided to terminate her, demonstrating a causal connection between her protected activity and her termination. On June 27, Wilkerson indicated the FMLA form would be faxed from Dr. Jochims' office to GPAEA. When Wilkerson arrived at GPAEA on July 2, GPAEA had not received the FMLA form. It was not until Wilkerson had been sent home and told that her termination was before GPAEA's attorney that Wilkerson provided the completed form to GPAEA. On June 28, 2012, Manske had sent an email to GPAEA's attorney, Richard Gaumer, informing of GPAEA's decision to terminate Wilkerson:

> Sally Lindgren and I have put together a document summarizing the events that have *led us to the conclusion to terminate Ms. Wilkerson* .... In addition to the habitual absences, Dr. Lindgren has determined [Wilkerson] has accomplished very little while on the job. We have given her every opportunity to correct her situation to no avail.

Manske email to Gaumer dated June 28, 2012, Def.'s App. 57, ECF No. 27–3. Again, even assuming the submission of the FMLA form constituted a protected activity, such protection would have been triggered when Wilkerson submitted the completed FMLA form on July 2, not when Wilkerson gave GPAEA her assurances on June 27 that the form would be completed. Wilkerson had given similar assurances to GPAEA for several months without fulfilling them. Moreover, as the Court has already found, the FMLA authorization indicated Wilkerson could perform the functions of her job.

■ The next date Wilkerson points to in attempting to demonstrate a causal connection is July 9, the date her

termination became official. This is another inaccurate representation of the record as the *decision* to terminate Wilkerson, which was no later than June 28, is the operative date in attempting to show discriminatory intent in relation to Wilkerson's alleged protective activity. July 9 was simply the date the formal procedure necessary for termination concluded. Accordingly, GPAEA made the decision to terminate Wilkerson's employment four days before receiving Wilkerson's FMLA form. In addition, more than a temporal proximity between protected activity and termination is generally required to present a genuine issue of fact for trial. *See Malloy v. U.S. Postal Serv.*, 756 F.3d 1088, 1091 (8th Cir.2014) (citing *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012)). "[E]vidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity." *Id.* (quoting *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1001 (8th Cir.2011)). As the court noted in *Malloy v. U.S. Postal Service*, an employee's "evidence of timing cannot be viewed in isolation .... [o]therwise, a problem employee on thin ice with the employer could effectively insulate herself from discipline by engaging in protected activity." *Id.*

In *Malloy*, as here, the employer repeatedly warned the employee about attendance problems before the employee requested FMLA leave. *Id.* The *Malloy* employer similarly allowed the plaintiff to take leave on several prior occasions "without repercussions suggesting that the employer was not hostile to the protected activity." *Id.* (citing *Chappell v. Bilco Co.*, 675 F.3d 1110, 1118 (8th Cir.2012)). It is undisputed in this case that Wilkerson was absent for all or part of nine workdays in March 2012 and thirteen workdays in April 2012, and she was absent the entire months of May and June 2012. GPAEA

communicated with Wilkerson and gave her numerous opportunities to provide medical certification for her absences to no avail. The temporal proximity between the decision to terminate Wilkerson and Wilkerson's submission of the FMLA authorization is not only without additional record support but is antithetical to the inference of nondiscrimination arising from temporal proximity to Wilkerson returning to GPAEA on June 27 after her visit to Dr. Jochims without the FMLA authorization form. *See id.* ("Any inference of discrimination arising from temporal proximity to the December 17 and 18 FMLA leave is undermined by the inference of nondiscrimination arising from temporal proximity to the December 27 unexcused absence.").

### 2. Legitimate Motive and Pretext

▇▇ Again, assuming although not finding Wilkerson had established a prima facie case of discrimination, GPAEA provided a legitimate, non-discriminatory basis for terminating Wilkerson—chronic absenteeism. Wilkerson argues this reason is pretext because the record shows that she missed many days in early 2012 due to her medical condition and that GPAEA never reprimanded, disciplined, or threatened discipline about her absences prior to May 24. Wilkerson further argues that Dr. Lindgren approved Wilkerson's absences in February and March, and that she was absent after April 24 because GPAEA required a return to work authorization from a medical provider. Wilkerson argues pretext is demonstrated by Dr. Lindgren's testimony that "the straw that broke the camel's back in my mind was the fact that [Wilkerson] was intending to come back July 2 at half-time because this is the story, this is the pattern, this is the over and over and over and over. And I could not carry that forward into a new year. I needed a full-time employee." Lindgren Dep. 68:10–68:16, Pl.'s App. 108, ECF No. 28-4.

Wilkerson concedes the aforementioned absences. The record demonstrates that GPAEA repeatedly advised Wilkerson she needed to provide support for her absences, and that on May 24, GPAEA provided Wilkerson with an FMLA form and informed Wilkerson of the consequences of not completing the form. There is nothing in this record to support Wilkerson's contention that her termination for chronic absenteeism was pretextual. *See Al Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1037 (8th Cir.2005) (holding that the plaintiff failed to carry his burden of showing the proffered reason for his termination—excessive absenteeism—was a pretext for intentional discrimination where the plaintiff merely contended his supervisor connived to set him up in order to discharge him based on his race, sex, religion, and national origin, reasoning that the record defied those contentions since the plaintiff was consistently given favorable evaluations, two wage increases, allowed to retake a promotional test that resulted in the plaintiff's promotion, and thus the evidence did not allow a reasonable inference that the supervisor plotted to discharge the plaintiff based on his race, sex, religion, or national origin). Nor is Dr. Lindgren's testimony that GPAEA could no longer tolerate Wilkerson's continuing pattern of excuses inconsistent with GPAEA's stated reason for Wilkerson's termination—chronic absenteeism. *See Malloy*, 756 F.3d at 1092 (reasoning that while the employer's stated reason for the plaintiff's termination was plaintiff's poor attendance, the employer's supplementary comment that the plaintiff's supervisors complained about her work performance was "not the sort of shifting explanation that supports an inference of discrimination" because the employer "maintained all along that [the plaintiff] was terminated for poor attendance" and that the employer "supplemented the consistent explanation with comments about [the plaintiff's] performance—perhaps to explain why leniency was unwarranted in this instance—d[id] not undermine the employer's legitimate reason for the action"). Wilkerson failed to show that GPAEA's legitimate, nondiscriminatory reason for terminating her was pretextual.

Wilkerson's FMLA discrimination claim fails as a matter of law.

## IV. CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment, ECF No. 27, must be **granted**. The above entitled action is **dismissed**.

**IT IS SO ORDERED.**